[No. 2037.]

## SI. LUCAS *v.* THE STATE.

1. MURDER — INDICTMENT.— See the statement of the case for an indictment *held* sufficient to charge the offense of murder.
2. PRACTICE — CONTINUANCE.— BILL OF EXCEPTIONS must be duly reserved to the ruling of the trial court refusing an application for a continuance; otherwise such ruling will not be reviewed by this court.
3. MURDER — FACT CASE.— See the opinion and statement of the case for evidence *held* insufficient to support a conviction for murder in the second degree, inasmuch as it does not establish with necessary certainty that the death of the deceased was produced by the criminal act of any one, and that it was not the result of accident or natural causes.

APPEAL from the District Court of Smith. Tried below before the Hon. F. J. McCord.

A term of five years in the penitentiary was assessed against the appellant, by the verdict of the jury which found him guilty of murder in the second degree, under the indictment referred to in the first head-note of this report, the charging part of which reads as follows:

". . . that one Si. Lucas, late of said county, on the 13th day of February, A. D. 1885, and in said county and state of Texas, did then and there, with malice aforethought, kill and murder one Joe Taylor, by cutting and stabbing him, the said Joe Taylor, with a knife; against the peace and dignity of the State."

J. B. Riley was the first witness for the State. He testified that he was one of the jury of inquest that sat on the body of Joe Taylor, on the morning of February 13, 1885. The dead body was

viewed by the coroner's jury about one hundred and fifty yards from the house of Tucker Ross, in Smith county, about eight miles northwest from Tyler, and on the Tyler and Mt. Sylvan road. Leaving Tyler the coroner's jury crossed a small branch or creek about one hundred yards from Ross's residence, passed Ross's residence, down a hill beyond, and found the dead body of Taylor, lying face downward, on the west side of the road. There was a small branch about seventy-five yards beyond the point where the body lay. The deceased's head lay northward, down the hill. A wound, inflicted, the witness thought, by a knife or some other sharp instrument, penetrated the left breast just below the nipple. It was about three-fourths of an inch in width. Its depth was not ascertained by the jury. Witness probed it with a stick, to the depth of about one and a half inches, but did not know that he reached the cavity. This wound, some of the jurors thought, was inflicted with a knife sharpened on both edges, while others thought the knife was sharpened only on one edge. A small pool of blood was found under the body, and the clothing was bloody down to the waist. The instrument inflicting the wound passed through the lappel of the coat, the vest and shirt. No examination of the body for other marks of violence was made, the jury deciding that death was caused by the wound. The jury tracked blood, or what they took to be blood, from the point where the body lay to the lower corner of Ross's cow pen, a distance of some seventy-five or eighty yards. The ground was covered with snow, and the spots traced as blood were pale red splotches on the snow near the wagon rut on the left side of the road. Witness could not say positively that these splotches were blood stains, though he thought they were. They may have been caused by muddy water slopping out of the wagon ruts. Tucker Ross's house could not be seen from the point where the body lay, intervening woods obstructing the view. The defendant was arrested on the ground during the progress of the inquest, by Constable Riley, and was searched, but no knife or other weapon was found on his person. Deceased had been dead some time when the inquest was held, and the body was stiff.

Tucker Ross, the next witness for the State, testified that he lived in Smith county, eight miles northwest from Tyler. He last saw Taylor alive, late on the evening of February 12, 1885. He came by witness's house from Tyler, going towards his own house about a mile northwest from witness's house. He was driving a "spike" team,— two mules hitched to the tongue of his wagon, and a mare in the lead. He passed witness's house, and stopped his wagon and

team some fifteen or twenty steps below witness's cow pen, and came back to witness's house, stopping at the gate, and sending word to witness by his little boy that he wanted to see witness. Witness went to his gate and found the deceased talking to witness's son, Andrew Ross, and the defendant. The three parties stood outside the gate between the wood-pile and the road. Deceased appeared to be somewhat under the influence of whisky — was nearly drunk — and was talking to the defendant in a loud, peremptory voice. As the witness got out of the gate, the deceased said to defendant: " Well, Si., I suppose you have heard that I have been talking about you." Defendant said: " Yes, Uncle Joe, I have heard that." Deceased then said: " Yes, I have; and I suppose you have heard, too, that I have been keeping your sister." Defendant replied: " Yes, Uncle Joe, I have heard that too." Deceased then said: " Yes, by G—d, I have been keeping her, and G—d d—n you, I am going to keep on keeping her." Apprehensive that such talk would bring on a difficulty, witness called to his son Andrew and the defendant to come into the yard away from Taylor, as he was drunk. He told the deceased to go on home; that it was too cold to talk business, and to come back at some other time to see witness and the boys. Defendant did not appear to be angry, and witness thought that deceased talked in the manner he did only because he was drunk.

At about this time Perry Hall came from the house to the wood-pile to get some wood. Taylor turned at once upon Perry and began telling how badly his mother and brother had treated him, Taylor, in breaking their contract to work for him. Perry responded that he was not responsible for what his mother and brother had done, and after some further talk the deceased began cursing Perry and tried to seize him. Perry backed to escape him, but deceased finally caught him by the coat collar, when Perry pushed him with both hands and he fell on his back. Defendant and witness's son Andrew then interfered. Defendant helped deceased up. Andrew Ross picked up deceased's hat and put it on his head. Defendant then took deceased's arm and said: " Come on, let me put you on your horse, so that you can go home." Witness told the boys to go in the house, let deceased alone, and he would go home. Andrew, Perry and Link Bailey started to the house with witness, and the defendant with the deceased towards his wagon. As witness and his party reached a point about half-way to the gate, Andrew, Perry and Link being ahead of witness, witness heard both defendant and deceased call out: " Whoa!" Witness stepped back

into the road and saw the deceased's team running off down the road, and deceased walking briskly after them. Defendant was then coming back towards the house. Witness remained looking down the road long enough to see the deceased overhaul and stop his team. When he last saw deceased he was standing by his saddle mule, with his hand on the saddle as if in the act of mounting. Witness then went into his house.

A part of the time while going to the wagon, the deceased and the defendant were out of sight of the witness, the corner of the cow pen intervening. It was at such time that witness heard the parties call "whoa." Witness went direct into his house, and defendant followed him in immediately. Witness saw no more of the deceased until next day, when he saw him on the road, dead. Defendant at that time was in the employ of the witness. He, Perry and Andrew roomed together in a small out-house in the yard. Witness was in their room until about 9 o'clock that night. The three parties named and Link Bailey were together in that room. Witness heard nothing said by any one about deceased on that night. Bailey was not present when deceased first came up to witness's house. He came up a short time before deceased left. About 9 o'clock on the next morning, Mr. Head, a white man, stopped at witness's gate and told him that the body of a dead man was lying in the road below witness's house, and asked witness to go with him to the body. Head, witness and defendant went to the body and found it to be that of Joe Taylor. The head lay in a little path on the west side of the road, near the west wagon rut, but not near enough to be passed over by a wagon traveling the road. His face was down and his head was north, or down the hill. Witness went at once to Tyler on a mule which defendant caught and saddled for him, and notified the justice of the peace. Witness, the justice and jury got back about noon, and the inquest was held where the body was first found. Constable Riley arrested the defendant while the inquest was in progress, and took him to jail that evening. The deceased was between forty and fifty years of age.

Andrew Ross was the next witness for the State. He testified that he lived with his father, Tucker Ross. He last saw the deceased alive on the evening of February 12, 1885. Deceased came to Tucker Ross's house that evening from the direction of Tyler in a wagon drawn by a "spike" team. He stopped his wagon at the upper or southeast corner of the cow pen, north of the house. Witness and defendant, who had been to the lot, joined the deceased near the road in front of the house. This witness testified substan-

tially as did his father, Tucker Ross, as to the talk between defendant and deceased, and between deceased and Perry Hall, and as to the altercation between deceased and Hall, except that, according to this witness, the deceased and Perry Hall both fell face downwards in the scuffle. Those present at this time, besides the defendant and the deceased, were Tucker Ross, Perry Hall, Link Bailey and the witness. Witness's mother, Sarah Ross, was then standing at the gate in front of the house, some thirty or forty steps from the road. When the various parties named, except the deceased, went back into the yard, they went pretty much together, the defendant somewhat in the rear and going in last. Witness, defendant and Perry Hall roomed together in the "office" in the yard. Link Bailey spent that night with witness, sleeping with Perry Hall, in one bed, and defendant and witness sleeping together in another. No supper was eaten at Tucker Ross's on that night. While sitting before the fire in the office early that night, the defendant pulled a knife from his pocket and said: "Why, I have got Bill's knife, and didn't know that I had it." He then threw the knife on the floor and remarked that he had a mind to break it. Some one of the boys advised against breaking the knife, and defendant proceeded to whittle a stick with it. It was a common wooden-handled pocket-knife with a hook-pointed blade. Witness found this knife in a cigar box in defendant's trunk a week or two after the defendant's arrest. That knife belonged to the defendant's brother Bill.

Nothing was said about the deceased in the "office" during the conversation that night, that witness could remember. The party sat up that night talking and singing, until about 9 o'clock, during the larger part of which time Tucker Ross was present. A Mr. Head reached Ross's house about 9 o'clock on the next morning, and reported the discovery, down the road, of the dead body of the deceased. Witness, Perry Hall, Link Bailey, Jerry Tucker and the defendant stayed with and watched over the body during the absence of Tucker Ross in quest of the justice of the peace. A person standing at Tucker Ross's gate could not see the defendant and the deceased after they left the place of the scuffle between deceased and Hall, going to deceased's wagon. They could be seen from the road,—thirty steps from the gate.

Link Bailey testified, for the State, that he lived on Tucker Ross's place, about two hundred yards from Ross's house. Witness heard the deceased, on the evening before his dead body was found, talking loud and cursing, before Ross's gate, and he went to Ross's to

see what was the matter. Witness reached the parties during the altercation between deceased and Hall. After some preliminary skirmishing, deceased caught Hall by the coat collar, and Hall pushed or shoved him down, face first. Hall fell on deceased with his arm around deceased's neck, holding him down. Defendant pulled Hall off the deceased and raised deceased to his feet. Andrew Ross put deceased's hat on his head. Defendant then asked deceased to go on home. As to the location of the wagon, and what transpired in the room or "office" that night, the testimony of this witness agrees with that of Andrew Ross, except that he declared that Tucker Ross was not in the office that night.

On the next morning, after Tucker Ross started to Tyler to notify the justice of the peace of the discovery of the dead body, witness, defendant and Perry Hall were together at the wagon shelter. While out there the defendant said: "I wonder if I hurt that old man last night when I cut him." Witness asked: "Why, did you cut him?" Defendant made no reply but laughed quietly. Nothing was said by the defendant or any one else about the deceased or the episode in front of Ross's gate, on the previous night, after deceased left Ross's premises. The witness told no one about defendant's statement at the wagon shelter until he went before the grand jury.

Perry Hall was the next witness for the State. He testified that the deceased was considerably under the influence of whisky when, on the evening of February 12, 1885, he drove past Ross's house, stopped his team, as related by previous witnesses, came back to Ross's gate and engaged defendant and Andrew Ross in conversation. Witness did not know of his own knowledge what deceased said to defendant prior to his, witness's, arrival on the scene. When witness joined the parties deceased turned from defendant to him, and said: "Well, Perry, your folks have treated me like a d—d dog. They have left me after agreeing to stay with me during the year, and after I have wintered them." Witness replied: "Well, Uncle Joe, I can't help what they have done. I have always treated you right, hav'n't I?" Deceased replied: "Yes, but the whole root and branch of you are mean." He then proceeded to curse the defendant, and finally, after the witness had backed into the road within ten feet of the wagon, the deceased caught witness by the collar, when witness struck him with his fist, and he fell in the road to his feet and hands — "all fours" — and witness got straddle of his back, and probably had one arm about his neck. Witness did not remember, and did not think, that defendant pulled him off the

deceased, though he may have done so. His impression was that
he got off of his own accord. Defendant and Andrew Ross raised
deceased to his feet. Defendant took deceased's arm, and said:
"Come on; Andrew and I will put you on your mule, and you can
go home." Both Andrew and defendant went with deceased and
tried to help him on his saddle mule. Deceased would not get on
his mule, but persisted in cursing defendant, and telling him to let
him alone. Finally he sat back against his wagon tongue, ran his
hand into his pocket, and said to defendant: "If you don't let me
alone, I will cut your guts out." Defendant replied: "If you talk
about cutting my guts out, I will cut yours out." He, defendant,
then struck deceased a kind of "side-wiping" blow with his fist on
the breast, and deceased fell back under the wagon. The team
started at once down the road, the wagon passing over the deceased.
As the team started, defendant and deceased both shouted "Whoa!"
Deceased got up and followed after his team, and when the witness
last saw him he had stopped his team, and was standing by his
wheel mule, with one hand on the saddle. Defendant and Andrew
Ross were then on their way to the house.

Witness did not think that the defendant was the first of the re-
maining parties to pass through the gate going back to the house, but
was certain that he was not the last. Witness saw no knife or other
instrument in defendant's hand when he struck the deceased at the
wagon. Andrew Ross was standing near defendant and deceased
when that blow was struck. Link Bailey was then standing near
the witness, some ten or fifteen feet in the rear of the wagon.
Tucker Ross was standing to one side, towards his house, and his
wife Sarah was standing at the yard gate. Andrew Ross, if look-
ing, could easily have seen the blow struck by defendant. Witness
did not know whether or not Andrew and the others present were
then looking at the parties. Witness was positive that supper was
served at Tucker Ross's house on that night. After supper defend-
ant, witness, Link Bailey and Andrew Ross repaired to the "office,"
where they spent the night. Witness did not remember seeing
Tucker Ross in the office that night. While sitting about the fire
in the office that night, defendant asked the question: "Do you
reckon I hurt old man Joe when I cut him?" Link Bailey replied:
"You must have hurt him, Si.,—you hit him too hard." Defend-
ant replied: "I think, too, that I must have hurt him, for the blood
was coming before I pulled the knife out." Andrew Ross, speaking
up, said: "Oh, I don't reckon you hurt him." When these remarks
were exchanged the defendant had a knife in his hand, whittling a

stick. Nothing else was said about the matter that night that witness heard. The witness never afterwards heard defendant allude to the matter, and had no recollection of the statement testified to by Link Bailey as having been made by defendant at the wagon shelter next morning.

Early on the morning that the dead body was found, Tucker Ross requested witness, defendant and Andrew Ross to go out and hunt up a certain little bull that had not come up during the night. The party started down the road north, when the defendant said: "I don't want to go down that way, I guess he (the bull) will come up." Witness replied: "I don't want to go down that way either." Witness was unwilling to go in that direction because he feared, from what defendant had said, that they would find Taylor's dead body down there somewhere. While the party were standing in the road discussing their route, the little bull came up the road and was penned by the party. Witness, defendant, Andrew Ross and Link Bailey watched the body while Tucker Ross was gone to Tyler after the justice of the peace. Defendant said, while down there, that the deceased may have frozen to death. Defendant was arrested and taken to jail on the day of the inquest. The witness was also arrested for the same offense. While in jail the witness confessed that he killed the deceased. This confession was untrue. He made it at the persuasion of the defendant, who said that if witness would so confess, the confession would clear him, defendant, and he could then clear witness. Two white men, Price and Knight, who were in jail with witness, advised him to confess if, in fact, he had killed the deceased.

Elijah Taylor testified, for the State, that about two months before the death of the deceased, he saw the defendant at Hopewell colored church, eight miles north of Tyler, and heard him talking to some parties whom he, witness, did not know. Defendant told those parties that he would kill the deceased, if he, the deceased, did not quit keeping his sister. Witness first gave this information on the first day of this trial to the district attorney. Witness was not related to either the deceased or the defendant.

Geo. W. Riley, constable, testified, for the State, that he went to the body of the deceased on the 13th day of February, in a buggy and in company with Justice of the Peace W. E. Donley. A jury of inquest was summoned, and an inquest on the body was held on that day. Witness arrested the defendant at the inquest, and searched him, but found no knife or other weapon on his person. Defendant was pointed out to witness as the last person seen with

the deceased before his death. Witness saw the cut in the breast, the blood on the body and on the ground under the body, and the spots on the snow, leading back to the corner of Ross's cow pen, within seventy-five or eighty yards of Ross's house, which the witness and others took to be blood stains. Witness thought the spots were blood stains, but would not so swear. The State closed.

B. T. Erwin was the only witness for the defense. He testified that he raised the defendant, who was twenty-three years old. Prior to this trouble, the witness had never known the defendant to be involved in a difficulty. His reputation was that of an exceedingly quiet and peaceable boy. He had two brothers, Clem and Bill, both younger than himself, and a sister Jane, fourteen or fifteen years old, who lived with the deceased at the time of his death. His mother was dead. Witness did not know the whereabouts of his father, if alive. Witness saw the body and blood of the deceased, and the supposed blood stains on the snow, and described them substantially as the preceding witnesses did.

It was admitted by the district attorney that Perry Hall was indicted at the spring term of the district court for the murder of the deceased, and that on his motion the prosecution against him was dismissed at the present term.

The motion for new trial presented the questions discussed in the opinion.

*White & Edwards*, for the apppellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

Willson, Judge. I. It was not error to overrule the motion in arrest of judgment, based upon the insufficiency of the indictment. It is well settled by the decisions in this State that the form of an indictment for murder such as the one used in this case is sufficient. (Willson's Cr. Forms, p. 173, Form 388, and note thereto.)

II. This court cannot consider the assignment of error calling in question the refusal of the court to grant the defendant's application for a continuance, because there is no bill of exceptions in the record presenting that question. (*Prator* v. *The State*, 15 Texas Ct. App., 362, and cases there cited.)

III. To our minds the only serious question in this case is as to the sufficiency of the evidence to sustain the conviction. Does the evidence sufficiently establish that the death of the deceased was produced by the criminal act of any one, and was not the result of

accident or natural causes? This must be clearly and satisfactorily proved by the State. Mr. Bishop says it must be proved with "particular clearness and certainty." (1 Bish. Cr. Proc., § 1059; *Lovelady* v. *The State*, 14 Texas Ct. App., 545; *S. C.*, 17 Texas Ct. App., 286; *Walker* v. *The State*, 14 Texas Ct. App., 609; *Ah Hang* v. *The State*, 18 Texas Ct. App., 675.)

It appears from the evidence that the deceased was last seen alive late in the evening, near the residence of Tucker Ross. He was drunk, and was in charge of a wagon drawn by two mules and a mare. When last seen he was with his wagon and team, which were descending a hill on the road. At that time he seemed to be in the act of mounting one of the mules, which he rode while driving his team. Early on the next morning, not far from the place where he was last seen alive, his dead body was found on the side of the road, the body being face downward, and the head in the direction he was traveling when last seen alive. Upon the breast of his dead body was found a wound, which had been made apparently with some sharp instrument such as a knife. This wound was just below the left nipple. It was about three-fourths of an inch wide, but there is no evidence as to its depth. One of the witnesses ran a stick into it, about one inch and a half, but did not know whether or not the wound extended to the hollow. Under the dead body about a teacupful of blood was found, which had flowed from this wound. Deceased's clothes were also bloody. No further examination was made of the wound than above stated, and no examination was made to ascertain whether or not the deceased was injured in any other way. The jury of inquest and the trial jury concluded that this evidence sufficiently established that the death of the deceased was produced by the wound in the breast, and the jury of inquest seem to have made no further inquiry as to the cause of the death, not even ascertaining whether or not the instrument which inflicted the wound had penetrated to the cavity of the chest.

We do not think that a conviction should be permitted to stand on such uncertain, and, to our minds, unsatisfactory testimony as to so important a matter as the cause of death. It was certainly within the power of the jury of inquest to have ascertained clearly and certainly the extent of the wound, and whether or not it was of a character likely to produce death. If it was a superficial wound, not reaching to the cavity, not severing any artery, or large vein, it is not probable that death resulted from it. It was not proved that it was more than a superficial wound, or that it was in any respect

a mortal one, and in the absence of such evidence the defendant is entitled to the presumption that the wound was not a mortal one, and did not produce the death of deceased.

It is not clearly and satisfactorily shown that the deceased did not die from accident or natural causes. It was a cold night, the ground being covered with snow, and the deceased was drunk. Under these circumstances he may have frozen to death. He had also been greatly excited just before leaving Ross's house, and left there in a state of great excitement, having been there engaged in an altercation and fight in which he had been pushed or knocked down. It is not unreasonable or improbable that under these circumstances he may have died from a natural cause, such as congestion, heart disease, etc.

We cannot give our sanction to a conviction upon testimony of so inconclusive a character. By doing so we would make a precedent dangerous to life and liberty, and in conflict with the wise requirements of the law.

Because the conviction is not sustained by the evidence, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered October 24, 1885.]